Case No. 16-5270, Detroit International Bridge Company, a Michigan Corporation et al., Appellants v. Government of Canada et al., Mr. Humes, Appellants, Mr. Lundman, Federal Appeal, Appellants. Good morning, Your Honors. We have four basic arguments on appeal. Two relate to Section 3 of the International Bridge Act, or IBA, one relates to Section 4 of the IBA, and one relates to the Congressional Acts relating to the Detroit International Bridge Act's Ambassador Bridge. Unless the panel has a preference on the order of argument, I would like to begin with, I'd like to say something about each, but I'd like to begin with our challenge to the State Department's approval of the so-called crossing agreement under Section 3 of the International Bridge Act. Your Honors, Section 3 says, authorizes the Secretary of State to approve such agreement, referring back to an agreement that, quote, I've reserved four minutes' time, and authorizes approval for an agreement between, quote, a State or a subdivision or instrumentality thereof, end quote, with an agreement between those State or subdivision or instrumentality with Canada or Mexico relating to an international bridge. Your Honors, our submission really is quite simple. It's that State officers acting in violation of State law do not constitute a State or a subdivision or instrumentality thereof, end quote. There's been no adjudication that they were acting in controversy of State law. There has been no adjudication under State law by any State court. That is correct, Judge, I shouldn't tell. However, both the District Court and the government agree that the Secretary's approval of the crossing agreement... Actually, that's not exactly right. You did try to bring an action in State court, and the court said it was untimely. Is that right? Oh, yes. Oh, sorry. I want to be very clear and forthright. There has been no adjudication of the issue. Not only did we bring the action referenced in our opening brief, Judge Garland, which was dismissed as untimely, as you say. There's another action now where there's condemnation proceedings against the bridge company, and the same issue is being litigated. I do want to make sure that's disclosed. At this point in time, when you say it was acted unlawfully, that's not been adjudicated, and I'm not at all sure that we're at the right place to adjudicate that. I understand the question, Judge Sintel. Here's why I submit this is the right court to adjudicate it. The government itself, on That agreement became Federal law. Federal law. The agreement itself is Federal law by the government's admission. The Secretary is not competent to adjudicate the legality of the State actions. At most, the Secretary can act on a belief or on information, on Your Honor, I think the Secretary has no authority to approve it unless it's legal. This is not... Whoa, whoa, whoa. Unless it's legal. But what is the standard by which we're to determine whether it's legal? Does the Secretary have to make an adjudicated decision, or can the Secretary simply act on a legal opinion that the acts are legal? Your Honor, thank you for the question, because I really want to clarify something that may not have been clear enough in the briefs. We are not arguing... You had plenty of room in the briefs to clear it. If you had been a little more concise, maybe you could have got it in there. Excuse me, go ahead. We are not arguing about a procedural requirement for what the Secretary must do before approving. Our argument is that the statute does not authorize the Secretary to approve an agreement if it's invalid, and the court... Invalid according to who? The court. According to what standard? The court, on a de novo standard, is a question of law. Allow me, if I may, to illustrate... There's no reason to assume that every one of these agreement approvals would go to court. What I'm asking you is what the Secretary's duty is with reference to this legality question that you're asking. I think the Secretary's duty is the same as in any of the following three illustrations. If the Secretary were presented with an agreement, and forgive me if this seems facetious, about a tunnel, the Secretary would have no authority to approve it, and if the Secretary did, we could come to this court and invalidate it. That has nothing to do with whether the Secretary has to decide, by what standard the Secretary has to decide it's illegal to agree with the country. The same standard, a standard of law, a standard that is subject to de novo review. If the Secretary had been presented with a memorandum of understanding, signed, but that explicitly says this is non-binding, we can fool around with it later, we can adjust it and amend it as we see fit, and that was submitted to the Secretary for approval, we could come to court and invalidate it. It would not be an agreement, and that would be a state law issue. If the Secretary was presented with something other than that, however, to say, for example, the document with which the Secretary was confronted in this case, what is the Secretary's duty with reference to, where did it arise, and what is the Secretary's duty with reference to the legality of the actions of the state officials involved in the underlying agreement? The Secretary's duty is to comply with the law, and that is reviewable under de novo. And the law requires the Secretary to make a determination with reference to the agreement. The law requires, the law only authorizes the Secretary to do what's in the statute. The statute only authorizes the Secretary to approve an agreement by a state or a subdivision or instrumentality. It's got to be an agreement, it's got to be by those entities, and it's got to be about a bridge. In this case, the Secretary had in front of him what purported to be exactly what you just described. What was missing in what the Secretary was proving in this case? What was missing? I'm sorry, Your Honor, I don't understand the question. What was missing from what the Secretary did? Yeah, you just described what the Secretary has to have. The Secretary had that in this case. No, it did not. It did not because the agreement it had was executed by state officers acting in violation of law. Now, that's the problem that you're raising is you're saying the Secretary had in front of him exactly what purported to be exactly what he needed. However, you're saying that all that purported to be an agreement, it wasn't because of a violation of state law. And I'm asking you, by what standard do we judge the Secretary's determination that it was legal? De novo. And I don't see how that can be. Well, Your Honor, what I'm asking you to consider— The Secretary would never have an adjudication. Well, he might sometimes, but he's not in this case having an adjudication of illegality. He had an opinion of the Attorney General that it was legal. Why does that not necessarily connect with the Secretary to act reasonably as opposed to make an adjudicated determination? An agency's obligation to comply with the law does not depend on the agency's expertise in the law. An agency is always obliged to act lawfully, both within the statute that authorizes it and the Constitution. I don't think I'm going to get any further with you on that question. All right. I will. I understand, Your Honor. Let me see if I can get the ruler with you for a minute. You cite sort of your theory to this IGRA case, Pueblo of Santa Ana v. John Calvin. Is that right? Yes. And that case, you like the way the Tenth Circuit did that case. Is that right? Yes, Your Honor. I recognize we like about the IGRA cases, and I accept all of them, and Judge Collier did as well, is that they say that it is a federal question whether or not it's valid under state law. They do say, and this may be where Your Honor is headed, Chief Judge Groen, that there's no obligation on the part of the Secretary of Interior in those cases to look at state law. And they say that in the course of saying the Secretary's approval can't possibly validate something that is unlawful under state law. So as I read this case, what this case says is Congress did not intend to force the Secretary to make extensive inquiry into state law. However, that does not mean that consequences should not flow if it turns out the state has not validly bound itself to the compact. And in that case, the state court, in the end, decided that it wasn't lawful under state law. Well, it seems to me, why isn't that where we are here? That is, the agency has done a review. You don't like the review that they did, but they did a review. And that should be the end of the question for us. If you win in the Michigan court, then the agreement's invalidated and there's no agreement. And nothing that the Secretary of State or the President approved says anything about that. They've only approved an agreement. If there is no agreement, then there's no agreement. So if you want to fight the state law case, assuming that you can overcome your failure to be timely in the state court, then that's the place to fight it. Why isn't that the answer to this? Because both the district court and the government agree this is federal law. And the court has an unflagging obligation. I don't care what the district court and the government agree to. The question is, there is an agreement as far as the agency is concerned. They think there was an agreement, not as if they could explore all of the law, but in terms of the state attorney general giving them an opinion, they think there was an agreement. They've approved that. If you can now later show in a state court that it is not an agreement, then the whole deal's off. And that will be too bad if there's construction and everything else after that. But you'll have to wait until that happens. We could do that. We may do that. That happened in the other case. You're trying to do that. But there's still a federal question of whether the State Department is authorized to approve something that's an invalid agreement. And normally our review on these things is arbitrary and capricious standard. And our question is, were they arbitrary and capricious in concluding that there was an agreement here? Yes, they were, but, Your Honor. No, but your position is that's not good enough, right? Your position is the review has to be de novo. That's true, but we make both arguments. To be clear, we make both. But if I can just take one more second on de novo, there is a contrary to law standard in the APA. It's not just arbitrary and capricious. And it's contrary to law for the State Department to approve something that is not an agreement between a state or subdivision or instrumentality. Plain text of the statute, they're not authorized, this court is competent. And it's not the most unusual thing in the world for a federal court to decide a federal question that turns on a predicate question of state law. Well, that depends on whether you're right that it turns on. You're arguing by tautology here. You assume that you're right, that the definition of agreement is one of federal law, and that the federal court has to decide whether the state law is correct or not. The statute doesn't say that. It's true that if we assume the result of your argument, that you win your argument. But that's the question before us. And the statute gives us very little support for the proposition that that's our job. I would simply ask you to consider Chief Judge Garland, my example of the MOU, where it's not clear it's binding. It's not clear that it's agreement. I think that would raise a federal question. I don't think this is any different. It may turn on a predicate question of state law. But this is a significant thing. They approve it, it becomes federal law. Now the federal question is, did they have authority to approve it? That's our de novo argument. Very briefly, since I'm going to run out of time, the arbitrary and capricious standard, please, I would exhort the court to compare Addendum 91 and Addendum 94, the unambiguous prohibitions against MDOT and MSF signing these agreements, with joint appendix letter 685 to 86. That's the letter from Deputy Attorney General Carol Isaacs. Not a formal opinion, mind you, not from the Attorney General. It has one sentence on those two unambiguous prohibitions. It doesn't address them. It doesn't explain why they don't apply. There is no argument for why they don't apply. It is arbitrary and capricious as well as de novo. Your Honors, I'm going to run out of my rebuttal time, but if I could I'd touch upon the other three arguments quickly. Unless the non-delegation doctrine is completely dead, this is a case where it applies. There is nothing in the statute providing any guidance. At 635 of the joint appendix, the State Department admits the statute provides, does not provide a particular standard. There's no case where the agency itself admits that. Second, Your Honors, count 6, which is our section 4 argument. There's a jurisdictional question there. There is no question it was the agency who took the action, none. The only question is whether the APA doesn't apply if the agency is delegated the power to take the action from the President rather from the Congress. We submit it makes no difference. It came from Congress through the President to the agency, but it's the agency who took the action. The Franklin Supreme Court case founded a close call whether even the President is exempt from the APA, and they relied on the plain text of the statute. The plain text of the statute here makes crystal clear all agency action is subject to review unless it's explicitly carved out. Finally, Your Honors, on our argument relating to our statutory rights, I think it boils down to this. There can be no dispute that the International Bridge Act of 1972 did not in any way, could not, infringe upon our rights. If they were arguing it, that it did infringe upon our rights, we would. Infringe upon what rights? The rights in our franchise statute from 1921, found at addendum 2 and addendum 10. Don't tell me where they're from. Tell me what that right is. Right. We have a right to make the right that we see. You're claiming an exclusive franchise? No. No, Your Honor, our argument is that we have a right to, quote, maintain and operate, end quote, our bridge with no time limit. And what we are saying is that right is meaningless if we can't build our twin span. And that if the, under the International Bridge Act, and the International Bridge Act's legislative history recognizes those rights and says that the statute should not be construed in a committee report to adversely affect those rights to repair, replace, or enlarge existing bridges because that's how you maintain and operate it in perpetuity. If under the International Bridge Act. What you seem to be pursuing here is the restraint of the building of the other bridge. Right? I'm sorry. You're not claiming that the government prevents you from doing things to your bridge, improving, expanding, whatever it is, are you? Correct. We've claimed that in other cases, which has been before this court. But our claim here before this court now is that the construction of this Canadian government bridge will make it impossible. Makes it uneconomical. That's correct, Your Honor. That is correct. There's a vast difference between not permitting you to do something and doing something off to the side that makes it uneconomical for you to do it. These are not the same thing. Well, that's the question, Your Honor. And here's what all I would quickly submit. If under the International Bridge Act they approve. In effect, you're claiming an exclusive franchise, right? I don't believe we are, Your Honor. The only interference that you are alleging is the building of a competing bridge, right? Your Honor, we've alleged facts which must be taken as true. What is it that's preventing you from doing to your bridge what you say you have the right to do? It would be economic madness, absolute insanity. How is that different than what I asked you? I'll tell you how it's different. You wanted an exclusive franchise. Because if the traffic levels were high enough to justify both bridges, the only way we could stop them would be an exclusivity argument. We would lose the argument we're making now. It's a huge, huge difference, Judge Sentelle. Under the International Bridge Act, the State Department approved a bridge in the exact location of the Twin Span and said just build on the other side. I think you'd see this case differently. If they built it 100 feet away from our bridge and made it physically almost impossible. If it was physically impossible, then you'd have a very different case. That's right. And all we're saying is economically. But Your Honor, you're not alleging any problem of physics. You're alleging it's an economical case. I think economically. The same as the franchise, right? I think we submit, we allege that traffic levels are declining. You have to accept that as true. That they will take 75 percent of our commercial truck traffic. You have to accept that as true. And that we will have, it will be economically impossible. Madness. For us to build our Twin Span. And if we don't build it, our bridge will become a relic. And we'll be dead in a matter of a few years. We allege those facts. So that's what's going to happen. That's what we can prove. This is not a closed case. If we go and you go back and remand for facts and we can't prove that, then we'll have a different result. That's what we're alleging. Your Honor, sorry I just... You're over time, but I want to ask you a question. In your effort to be the first case since 1935 to find a non-delegation doctrine. Not to find a doctrine. Huh? To strike down the statute. Not to find a doctrine. To strike down the statute, right. So I'm having difficulty reconciling your argument with our decision in District No. 1 Pacific Coast District versus Maritime Administration. The statute in that case said a person may not, without the approval of the Secretary of Transportation, place a documented vehicle, a vessel, which was under the laws of the United States under foreign registry. That's all it said. And we held that because this was a narrow issue, that it was narrow in the sense of being only about transfers from American registry to non-American registry, and because it was an issue involving the foreign affairs of the United States, because it involved moving from an American to a non-American registry, this was not an unlawful delegation. Now in this case you have an even more narrow statute, one which only approves of passages across international boundaries, and, again, it involves foreign affairs because, by definition, it requires an agreement with Canada or Mexico. How can you reconcile your decision, your argument, with our decision in Maritime Administration case? Chief Judge Garland, I must confess that I don't have a mastery of really familiarity with the case. I hope to have something more for you on rebuttal, but it sounds much less clear to me. And just very quickly, much less clear to me the power that's being delegated there. Here you have a power that is very specifically delegated, assigned to Congress in Article I, Section 10, Clause 3. And a lot of these delegation cases, Your Honor, I submit, relate to interstitial issues of powers that lie between executive and legislative powers, and therefore they are understandably subjected to quite a lenient standard. Well, there's no argument about that in this opinion. That is, the question in the case is Congress has passed a statute about interstate commerce, which is within Congress's power, and it is delegated to the Secretary whether to approve certain kinds of transfers. Actually, that's exactly the same thing as was the case in the Panama case, which is the only predecessor that is anywhere near what you want, 1935. It wasn't a general authority under some compact laws or anything else. It was under interstate and foreign commerce. And that's what this case was. Well, the power to regulate commerce is a much more general power than the power to approve compacts with foreign government, which is on constitutional thin ice to begin with because Article 1, Section 10, Clause 1, absolutely prohibits states from entering into treaties, period. End of story. I don't understand why it's on constitutional thin ice when there's a compact clause. Well, because a treaty would be on constitutional, period, and agreement or compact needs Congress's consent. Now, Congress has delegated the power to give that consent. That seems to me to warrant some greater constitutional scrutiny. Than the power to regulate interstate and foreign commerce? Congress can't delegate that. The delegation, respectfully, I don't think is as narrow. That sounded like a very narrow delegation of changing registries. I don't even understand exactly how that's a delegation. That strikes me as an executive power. It doesn't strike me as a delegation. I understand that the opinion may not make the point I'm making. I'm simply saying that that's what I'm submitting to the court, that there is a different analysis when you're looking at something that's arguably an interstitial power between executive and legislative rather than something that is unambiguously signed only to Congress. Okay. We have our question. Thank you. May it please the Court. Robert Lundman representing the federal athletes. I will start off with Section 3 of the International Bridge Act. It's the Secretary's duty under that act to review the agreements, agreements between the state of Michigan here and Canada, but always agreements between a state and a foreign country and New Mexico about an international bridge for foreign policy. And that provides the intelligible principle to satisfy the international delegation test. I'm not sure that I followed the Supreme Court in Whitman, and I want to get the language right here. When Congress confers decision-making authority upon agencies, Congress must, I'm quoting a quote within a quote, lay down the legislative act, a legislative act, an intelligible principle, to which the person or body authorized to act is directed to conform. What is the legislative act in this case by which Congress has laid down an intelligible principle? Well, the legislative act is the International Bridge Act. That's not an act laying down an intelligible principle. That's the act, as you just said, that gave the Secretary the delegate. It gave the Secretary the duty. Nobody questions that they did delegate. The question here is did Congress comply with what the Supreme Court described in Whitman as laying down an intelligible principle by which the person or body authorized to act is directed to conform. So we have three responses. One, Whitman goes on to say when the statute is narrow. So, for example, when it's not like the Clean Air Act, the action of Whitman, which was really broad-reaching with wide impacts. When it's a narrow statute. At the outset, I will concede that the Supreme Court eventually in Whitman said there was not an unconstitutional delegation. Right, and it also set aside cases like this one where the act is very, very focused. It's focused bridge from the United States to Canada. And in that context, the court can easily infer that the State Department, who this task is assigned to under Section 3, is to review those agreements for foreign policy. And even if there was any doubt about that, the legislative history clears it up. There's a memo attached to the committee report that the committee report references. Do you seriously believe, you're not a novice here, do you seriously believe you're going to convict me of legislative history? Well... I see you did a course on that one. The Supreme Court expressly stated in Whitman that it had to be about legislative history. You know that a piece of legislative history is not a legislative act. And let me read you the language from Whitman that I think is very helpful for us on what else you can look at. And it's... The court... I'm not finding the quote, but it goes on to say, you know, the Clean Air Act, this issue at Whitman was very broad-reaching. In some cases, when it's a very narrow assignment of power, we don't need any words in the statute. And that's in Whitman itself. And this court has confirmed that context is relevant as well. And if you look at context here, and you look at the fact it's assigned to the State Department, whose bread and butter is foreign policy review, you can get to an intelligible principle. And that's the principle then the State Department wants. So you're saying not that you've complied with the language in Whitman, but that you don't... that I read. There's other language. With reference to the Legislative Act requirement, you're not saying you complied with it, but rather that you don't have to. Well, it depends what you mean by legislative. It talks about legislative act. And so it's not... I don't think Whitman is saying you just look at the text of the statute and keep your eyes closed to what the statute's addressing. Suppose I do think so. Have you complied with it then? Have we complied with it then? I think from the fact it's assigned to the State Department, and when you read this section, it's about international bridges, I think you can connect the dots readily. And it's enough here that when you take... the court has said you take a practical understanding of this issue, you don't parse the language in this kind of close reading way, you look at the big picture. And the big picture here, I think, is really clear. There's a principle. It's foreign policy review by the State Department. As to that review, the bridge company doesn't make any argument that that foreign policy review was arbitrary. What they're saying is, no, no, no, we need this state law issue resolved instead. And the state law issue being whether the State of Michigan was authorized to enter into the agreement or not. And I think that's an issue of state law, that's an issue of state courts to litigate, that's an issue of bridge companies litigating in multiple state courts, both the one that was recently dismissed and the condonation cases that Mr. Hume mentioned. And I don't think there's any text in the statute that indicates that the Secretary of State in Section 3 of the International Bridge Act has to go any farther than that. Well, I thought the argument that they were relying on was the phrase, such agreement. And they take from that that the Secretary could not approve this agreement if, arguably, it was facially invalid. And I thought what they were getting at was the fact that the Secretary had all this information from state legislators saying that there was no authority to enter into this agreement. And all, all, quote, the Secretary had was something out of the State Attorney General's office and the Governor's office. Well, two responses. I think the word agreement there, they're putting too much work on it. And it's not a facial attack. They're not saying that you look at the agreement and there's a facial problem with it, that it, that it's not an agreement, or that it's not a bridge, or that it's not the State of Michigan. Those are the examples Mr. Hume gave. And this isn't that, that case. There's no issue here that it's a bridge. There's no issue that the State of Michigan's name's on the agreement. Then you're right. The State Department got letters from state legislature, legislators, individuals in Michigan saying like, hey, there's a Michigan law issue here. And at that point, the State Department did not just stop. It wrote to the Governor, it wrote to the Attorney General and said, we need an answer to this. So in the record of decision, was the Secretary required to allude to the state law issue at all? I don't think it had to. However, attached in the responses to comments to the record... Well, that's what I was really getting at. That there's nothing in the record of decision. All we have is the Secretary's response to comments. Which is attached to the record of decision. It's the appendix to it. So I think it's, it's there. And it explains, this is what we did. And the response was from the Michigan Attorney General. But what I'm trying to understand is just sort of a legal point in terms of if the Secretary gives us five reasons and they all have to do with foreign affairs, international. And it has as an appendix a response to someone who raises what I understand your position to be a totally irrelevant issue. And the Secretary responds to it. So that we can see that the Secretary in a sense wasn't arbitrary and capricious by ignoring this comment. But in fact responded to it. But it's not a concession that the Secretary thought he had any obligation to address this issue. That's what I'm trying to understand. I don't think it's a concession that there was an obligation to do any sort of assessment under Michigan state law. But you seem to agree that he couldn't have approved an agreement if there was a state law that said under no circumstances does the Governor have any authority whatsoever to enter into... I'm just asking. I don't have a position on that question. We don't have that here. If there was a law, what we have is comments raising this possibility. And then the State Department doing its diligence on it and getting an answer from the Michigan Attorney General's office. Page 685, signed by the Chief Deputy Attorney General that has Attorney General's designee. Well, your brief isn't written in the sense that you view that as a separate alternative reason for approving. Well, I think our brief is... I tried to write the brief with the first argument being there's no duty under Section 3 of the Act to do this sort of state law analysis. In any event, the extent that this triggers arbitrary and capricious review, here's what the State Department did, and I think it easily satisfies that standard. The lurking problem here is another one the District Court identified, that if you go down this road of assessing the state law details, it would require the State Department to do that rather than the Michigan State Courts. Then the problem really arises of whether Michigan is the indispensable party under Rule 19 as the District Court concluded. And the District Court's conclusion is based on the fact that the British company was arguing that the District Court had to do this state law analysis. And that analysis would result in an opinion from a federal court saying, agreement is good or agreement is bad. And that then really drags Michigan's sovereign interest directly into the case and explains the Rule 19 holding as well. As to Section 4, there are two arguments we made about why that's not reviewable at this time. The first is the presidential permit. The first is it's a presidential permit. And the president had this authority pursuant to the Constitution to issue permits for cross-border bridges. That authority predates the International Bridge Act. It's recognized and explained in the executive order from 1968. And then the International Bridge Act comes along against that backdrop and endorses that view. And it endorses it very specifically. In Section 3, it assigns this approval review to the Secretary of State. But Section 4 says the permit decision is for the president. And when you've got that clear one-hand agency action, other-hand presidential action, I think that really strongly points to this being a presidential action that's not reviewable under the agency act. Can I ask you about that? Yes. So you're relying on Franklin for that proposition, right? Yes, among other things. That's the Supreme Court of the United States opinion, which beats all of ours. Right. So I would assume that you better rely on that. I rely on it. Yeah. So it seems to me the operative phrase there is the core question is whether the agency has completed its decision-making process and whether the result of that process is one that will directly affect the parties. In this case, the action that creates an entitlement and has a direct effect is the president's statement to Congress, not the secretary's report to the president. Now, in this case, by action of the executive order, the decision is over. The president never acted. The Secretary of Defense and the other people who were supposed to bring it to the president's attention did not do so. So there's no role for the president. Right? The president is not going to make a decision in this case and never has made a decision other than to delegate the decision to the Secretary of State. Isn't that right? There is the delegation, but I think because this is pursuant to the president's authority and confirmed and affirmed in the International Bridge Act Section 4, it's a president's action all the way through. Even if the president has delegated the decision to an agency? At least in this context where it's pursuant to the president's constitutional authority and a legislative act saying it's a presidential act. But, President, you could make an argument here that what the president done here is in violation of Section 4 because Section 4 doesn't allow for any delegation to anybody other than the president. Assuming that you think that would, and therefore what the president's done is void, but assuming you don't believe that, which I assume you don't, then you have to assume that the delegation is appropriate, in which case once the time has passed for the president to do anything, or, as in this case, the president was never asked to do anything, then the final action is agency action. I'm not sure why this is any different than, I mean, the Constitution provides for a unitary executive. That is, it provides for a president. It does not provide for the Secretary of State. It does not provide for the Attorney General. Those are provided by statute, and the president has delegated certain authorities to those, or Congress has delegated certain authorities. Now, of course, the president may always reverse those, but where the president has not acted, the matter is over. I don't understand why this case comes within Franklin, where, in that case, everything depended on the president's statement. I think there's two critical distinctions here that make this fall under presidential action. One is what the question is, the relevant question, we think, is what's been delegated, and what's been delegated is presidential power, and it doesn't lose its presidential power when the Secretary of State, because the president asked the Secretary of State to make the decision, does it. And the second point is this isn't a case where it's kind of a unitary executive theory in that it's inherently, you know, agencies are inherently acting on behalf of the president. We've got Congress in the Bridge Act drawing this line between Section 3 and 4 with respect to agency action in 3 and presidential action in 4, and so I think it's a really rare case in that it fits in that, and that we have such a clear distinction. But the other critical point is these international bridges, as the executive order explains, it's presidential authority, and that's what's being acted on. I think your fallback argument would be that this is committed to agency discretion. Yes. Maybe you want to talk about that. I'm happy to talk about that. And the analysis there is, well, what standard is there, and how broad is it, and whether it's committed to agency discretion by law or not? And the answer is yes. The standard here is simply national interest for the determination on whether or not to grant the presidential permit, and that doesn't provide a standard that the court can meaningfully review. So I assume that, like your colleague, you have not read District No. 1, Pacific Coast District. Well, we cite that in our brief on this prong, not on the unconstitutional delegation. And on this prong, it did say pretty much the same. You had a very similar statute, which gave the Secretary of Transportation authority to decide, didn't give any grounds other than the implicit ground of it having to relate to foreign affairs. And we did hold that it was committed to agency discretion. Right. And we think that's right. We think the legal assistance for Vietnamese asylum seekers is very similar to this one. It's in the same area of law, i.e. foreign policy. The court there says the agency is entrusted by a broadly worded statute with balancing complex concerns involving security and diplomacy. Here, Section 4 on the presidential permit, national interest determination, and a broadly worded statute, Section 4, as well. So we think that case, in addition to the district case, both point strongly to the answer being here that it's committed to agency discretion. Let me ask you if there's any more questions. Okay. Thank you. Is there any time left for rebuttal? All right. We allowed your opponent to have 50 seconds over. We, of course, gave you about five minutes over. But we'll give you another two minutes here. Very quickly, Your Honor. The point about this being a delegation of executive authority under Section 4 is just simply wrong. Since 1899, Congress had said no international bridge could be approved without congressional authority. Judge Collier has a very good description of this history at Joint Appendix 76-84. The executive order didn't delegate it because it required congressional authorization. Your Honors, there are multiple cases where very respected judges have breathed life into a non-delegation law. Are these all dissents that you're going to be citing? What's that? Are these all dissents that you're going to be citing? They're not all dissents. They're often narrowing constructions in the Sexual Online Registration, Sex Offenders Registration Act, Judge Gorsuch, then Judge Gorsuch in the Tenth Circuit, Judge Rogge in the Second Circuit, and both Justices Scalia and Ginsburg agreeing significantly in dissent in the Reynolds case, simply showing the significance. The Eighth Circuit did strike down a statute in South Dakota v. Department of Interior. It was vacated on appeal only because the agency changed its position. I don't think there's any dispute that there's a non-delegation doctrine. The Court said so in Whitman. The question is where you fall within that doctrine. That's fair enough, Your Honor. I simply am not sure it's actually quite accurate that no statute has been struck down since the Eighth Circuit did, although it was vacated, but for a different reason. I think just quickly on this, Counsel, the Department's position is that it does not matter how unambiguous the statute, the agreement, how unambiguous it is that the agreement is unlawful, they can still approve it. That's their position. In fact, I think their position is even if there was a Supreme Court, state Supreme Court case. That wasn't the position of the District Court's alternative holding. The District Court's alternative holding was that they did enough here. In the alternative holding, yes, but I think if you look at JA 139 of her opinion, her principle holding was it simply didn't matter. It could be no matter how unlawful. And, Judge Rogers, your question about an unambiguous statute, it's the nail on the head. That actually is what happened here. I, again, recommend the Court to look at Addendum 91 and 96. And, finally, we ask the Court for our underlying congressional intent and franchise argument to simply consider hundreds of millions of dollars have been spent building highways to the Ambassador Bridge. That's at Addendum 83. They said in the report to protect plans for the Ambassador Bridge twin span. They said when they enacted the Ambassador Bridge, don't adversely affect rights. That's at Addendum 65 to 66. Don't adversely affect the rights of bridges to repair and replace. None of this was considered at all in the State Department's approval of the NITSE. It did not comply with the necessity requirement in Section 4 of the IBA, which, Your Honor, we submit provides law to apply. Thank you. Thank you, Your Honor. Make the matter under submission.
judges: Garland, Rogers, Sentelle